IN THE UNITED STATES DISTRICT COURT

FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| ELECTRONIC PRIVACY INFORMATION CENTER,<br><br>Plaintiff,<br><br>v.<br><br>U.S. DEPARTMENT OF EDUCATION,<br><br>Defendant. | No. 1:13-cv-00345-GK |

**DECLARATION OF ANN MARIE PEDERSEN, ESQ.**

**IN SUPPORT OF DEFENDANT'S MOTION FOR SUMMARY JUDGMENT**

I, Ann Marie Pedersen, declare as follows, pursuant to 28 U.S.C. § 1746:

1. I am employed as Director of the Correspondence Services Unit, within the Communications Office of the U.S. Department of Education's (Department's) office for Federal Student Aid (FSA), located in Washington, DC. I have served in this position since May 2010, and have 11 years of Federal service. I make this declaration in support of the Department's Motion for Summary Judgment in the above-captioned action. I make the statements in this declaration on the basis of personal knowledge, my review of FSA files, and information I have received in the performance of my official duties.

2. My job duties and responsibilities include supervising the FSA employees responsible for the initial receipt and processing of Freedom of Information Act (FOIA) requests assigned to FSA, identifying and reviewing records responsive to FSA FOIA requests, and determining FSA's responses to FOIA requests. In performing these duties, I am responsible for managing FSA's FOIA program to ensure its compliance with the

information management requirements of the statute and the Department's implementing regulations, policies and procedures.

3. When FSA asserts any of the nine statutory exemptions to records responsive to an FSA FOIA request, as was true with respect to certain documents responsive to EPIC's request, the Department's central FOIA Service Center reviews the proposed redactions, affirms the proper application of the FOIA exemptions asserted, issues the decision on the request and produces the responsive documents to the requester.

## I.    EPIC'S FOIA REQUEST

4. By letter dated September 20, 2012, Plaintiff, the Electronic Privacy Information Center (Plaintiff or EPIC), submitted the FOIA request at issue in the litigation in which this Declaration is being filed. The Department administratively denominated EPIC's request FOIA Request No. 12-02019-F and assigned the request to my office for processing because it sought the following FSA records:

    1. The most currently updated version of the "PCA Procedures Manual" that the Department publishes as guidance for its debt-collection contractors. The 2009 version of this manual was prepared by the Federal Student Aid Operation Services Processing Division.

    2. All "Certification of Privacy Act Training" forms, "Quality Control Reports," and "Security Awareness and Privacy Act Training Reports" submitted by private debt-collection firms to the Department of Education during the last three years.

A true and accurate copy of EPIC's FOIA request is attached hereto as Exhibit A.

5. The Department identified a total of 2,832 pages of FSA records as responsive to EPIC's FOIA request. The scope of Plaintiff's FOIA request is undisputed and it is my understanding that Plaintiff does not challenge the adequacy of FSA's search for records responsive to the request.

6. By letter dated November 1, 2012, Plaintiff filed an administrative appeal under the FOIA for the Department's failure to respond to EPIC's FOIA request. A true and accurate copy of Plaintiff's FOIA appeal is attached hereto as Exhibit B.

7. On March 15, 2013, Plaintiff filed this FOIA lawsuit claiming that the Department had improperly denied access to the records responsive to its request.

8. By letters dated May 1, 2013, May 31, 2013 and September 26, 2013, the Department released to Plaintiff a total of 2,832 pages of records responsive to EPIC's FOIA request. However, the Department withheld 2,690 pages, or portions of pages, of responsive records, on the grounds that the information contained therein was exempt from disclosure pursuant to 5 U.S.C. §§ 552(b)(4) and/or (7)(E) (respectively, FOIA Exemptions 4 and 7(E)). The Department has responded to EPIC's FOIA request fully and in accordance with the statute. True and accurate copies of the Department's May 1, 2013, May 31, 2013 and September 26, 2013 letters to Plaintiff are attached hereto as Exhibits C, D, and E, respectively.

## II.  FSA's MISSION AND THE RECORDS AT ISSUE IN THIS LITIGATION

9. FSA is a principal office of the Department devoted to insuring that all eligible students can benefit from federal financial assistance for education or training beyond high school. Under the Higher Education Act Amendments of 1998, FSA became the government's first Performance-Based Organization to enhance its services through increased flexibility and performance incentives in exchange for greater accountability and results. FSA provides student financial assistance in the form of grants, loans, and campus-based programs. In FY 2012, FSA provided approximately $142 billion in financial aid to 15

million students at 6,300 postsecondary institutions. FSA's 1,200 employees operate out of offices in Washington, DC, and in ten regional offices across the United States.

10. FSA has the responsibility to effect the repayment of these loans in order to recoup the taxpayers' substantial investment in the higher education of student loan borrowers.

11. Loans in repayment are handled by servicers incentivized to work with borrowers to keep them in a regular payment pattern and to prevent borrowers from going into default. To this end, there are many Title IV benefits, flexibilities, and entitlements available to a borrower, such as deferments, forbearances, and a variety of repayment plans, including ones based on the borrower's income.

12. For a borrower to default on a student loan, the borrower must be 360 days delinquent on the loan. Once an account goes into default, it enters the default system for collections, the borrower loses all Title IV benefits and, pursuant to the terms of the promissory note signed by every borrower, the total amount of the loan, plus interest, becomes immediately due and payable. All resolutions of defaulted student loan accounts other than immediate payment in full are compromise settlements agreed to at the discretion of FSA's Default Division.

13. My office identified Dwight Vigna, Director of FSA's Default Division, as the appropriate subject matter expert on EPIC's FOIA request, and assigned this request to his office for fulfillment. Mr. Vigna has personal knowledge of the functions of the records responsive to the request in the work of his office, where such records are maintained. Mr. Vigna has held his current position since January 2006, and has been with the Department since 2003.

14. FSA's Default Division is responsible for FSA's student loan default portfolio which totals more than $52 billion in loans made to more than four million borrowers. The Default Division manages the Department's program to collect on defaulted student loans, and is responsible for review and oversight of FSA debt collection policies and procedures to ensure their compliance with applicable laws and regulations. The Default Division also conducts required reviews to ensure that testing is completed on all new functions being added to the Debt Management and Collections System (DMCS). The DCMS allows FSA staff to manage more than four million borrower accounts through the default collection processes and to report out the status of a borrower based on federal regulations.

15. In order to carry out its statutory and regulatory responsibilities to collect on defaulted student loans, FSA contracts with Private Collection Agencies (PCAs), operating under a performance-based contract that facilitate competition among PCAs and rewards those PCAs that can meet FSA priorities and goals (i.e., demonstration of respect for borrowers and achieving increased collection rates even as the default portfolio increases). FSA's PCAs are only compensated on collections received. FSA has worked over the past 15 years to develop procedures intended both to allow necessary FSA oversight of these contractors and to permit each PCA the flexibility needed to customize its collection work to achieve maximum recoupment of the defaulted loans owed to the taxpayers in accordance with all applicable laws. These procedures and other PCA requirements are detailed in the PCA Procedures Manual, Item 1 of EPIC's FOIA request.

16. This declaration focuses on the application of FOIA exemptions to: (a) the Private Collection Agency (PCA) Procedures Manual responsive to Item 1 of EPIC's FOIA request; and (b) the Quality Control Reports responsive to Item 2 of EPIC's FOIA request.

It is my understanding that Plaintiff does not challenge the Department's redactions made to the other records responsive to EPIC's request (i.e., the Certification of Privacy Act Training forms and the Security Awareness and Privacy Act Training Reports responsive to Item 2 of EPIC's FOIA request).

### A. THE PCA PROCEDURES MANUAL – EPIC REQUEST ITEM 1

17. Over the years, FSA's Default Division has developed the PCA Procedures Manual (Manual) responsive to Item 1 of EPIC's FOIA request to instruct the PCAs on their interactions with FSA's Default Division and borrowers.

18. The Manual sets out the Department's requirements for the PCAs' interactions with FSA and borrowers in order to ensure consistency in their collection practices and FSA's operational requirements.

19. The Default Division continually updates the PCA Procedures Manual. In October 2011, FSA converted the DMCS to a new platform that changed many of the collection processes that are used by the PCAs. Since that change, the Default Division has reviewed the PCA Procedures Manual monthly in an ongoing effort to ensure alignment of collection procedures with the new system.

20. The Manual is not publicly available, and FSA has shared it only with the 21 PCAs who have a prime contract with the Department. FSA provides for the confidentiality of this document by both the terms of the PCA contract and a confidentiality notice. Section 6.2.7 of the contract states: "The contractor shall ensure that sensitive information shall not be released outside the control of the organization. . . ." Moreover, the entire Manual is covered by the following notice on each page: "Distribution authorized to the Department of Education and its Private Collection Agency contractors only."

21. The PCA Procedures Manual describes for the PCAs the collection tools available to them. In its dealings with the PCAs, the Department stresses above all other goals the demonstration of respect for borrowers. Moreover, the conduct of individual collection agents is governed by the terms of the Fair Debt Collection Practices Act (15 U.S.C. § 1692a, et seq.).

### B. THE QUALITY CONTROL REPORTS – EPIC REQUEST ITEM 2

22. Among other things, the PCA Procedures Manual requires the PCAs to submit to the Department the monthly Quality Control Reports responsive to Item 2 of EPIC's FOIA request. See PCA Procedures Manual, Chapters 16 and 17. The referenced required reports contain both specific categories of information the Department requires to be included and proprietary performance measurement strategies devised by each PCA to maximize contract performance for business clients including, but not limited to, the Department.

### III. FOIA PROTECTS THE INFORMATION AT ISSUE IN THIS LITIGATION

23. Beginning at ¶ 24 of this declaration, I have described the types of information to which the Department denied Plaintiff access pursuant to FOIA Exemptions 4 and 7(E) and, for the exemptions cited in the Department's determination on EPIC's FOIA request, have described the rationale for withholding such information under the FOIA.

### A. PCA PROCEDURES MANUAL (EPIC REQUEST ITEM 1) – EXEMPTION 7(E) REDACTIONS

24. Exemption 7(E) protects "guidelines for law enforcement investigations or prosecutions if [their] disclosure could reasonably be expected to risk circumvention of the law." 5 U.S.C. § 552(b)(7)(E). The courts have applied Exemption 7 to protect information related to civil law enforcement activities as well as to criminal matters. Further,

Exemption 7(E) provides protection for various types of law enforcement materials, including law enforcement manuals and settlement guidelines.

25. Title IV of the Higher Education Act of 1965, as amended (the HEA) (20 U.S.C. 1071, et seq.) authorizes FSA to perform collection and administrative resolution activities with respect to debts resulting from non-payment of student loans and grant overpayments made under the various Title IV student aid programs, in compliance with other statutes generally governing debt collection activities. See PCA Procedures Manual, Chapter 1.

26. As discussed at ¶ 15 above, FSA contracts with PCAs for the performance of such collection activities, in accordance with procedural guidance set forth in the PCA Procedures Manual responsive to Item 1 of EPIC's FOIA request. As such, the PCA Procedures Manual was clearly "compiled for law enforcement purposes" within the meaning of Exemption 7, and it comprises a type of guidance for which Exemption 7(E) is available.

27. As discussed at ¶ 20 above, the current PCA Procedures Manual is not publicly available, and FSA has shared it only with the 21 PCAs who have a prime contract with the Department.

28. As discussed at ¶ 12 above, the promissory note that all student loan borrowers sign provides – when a borrower does not make payments and a loan goes into default – that the total amount of the loan, plus interest, becomes immediately due and payable. All resolutions of defaulted student loan accounts other than immediate payment in full are compromise settlements agreed to at the discretion of the Department. The PCA Procedures Manual describes for the PCAs the collection tools available to them, and the proper implementation of those tools.

29. Pursuant to Exemption 7(E), the Department denied Plaintiff access to guidelines for PCA personnel engaged in collection and administrative resolution activities aimed at maximizing recoupment of defaulted student loans (e.g., collection objectives, negotiating tools, settlement strategies, and compromise guidelines, ranges and criteria), contained on 251 pages of the 309-page PCA Procedures Manual responsive to Item 1 of EPIC's FOIA request.

30. This information is protected under Exemption 7(E) because its public disclosure could reasonably be expected: (a) to lead student loan borrowers who have defaulted to seek to avoid the legal consequences of defaulting on their contractual obligations to repay the full amount owed to the Government; and (b) to permit potential defaulters who are otherwise able to repay their student loan debts to avoid doing so. The disclosure of this information could reasonably be expected to accord student loan borrowers an unfair advantage in the default negotiation process, to the detriment of the public fisc. Moreover, disclosure could reasonably be expected to risk circumvention of the law by commercial entities marketing debt-related services to borrowers who possess the resources and motivation to manipulate the collection procedures to avoid their obligation to repay the debt they owe the taxpayers.

31. The information withheld pursuant to Exemption 7(E) is identified in the Vaughn Index attached as Exhibit F.

### B. QUALITY CONTROL REPORTS (EPIC REQUEST ITEM 2) – EXEMPTION 4 REDACTIONS

32. Exemption 4 protects "trade secrets and commercial or financial information obtained from a person [that is] privileged or confidential." 5 U.S.C. § 552(b)(4). This exemption is intended to protect the interests of both the government and submitters of information.

Exemption 4 affords protection, inter alia, to submitters who are required to furnish commercial or financial information to the government by safeguarding them from the competitive disadvantages that could result from disclosure. To be protected under Exemption 4, the information at issue must be commercial or financial, obtained from a person, and privileged or confidential.

33. Information is considered commercial or financial if it relates to business or trade, or if it pertains, relates to, or deals with commerce. Some examples of items usually regarded as commercial or financial information include: business sales statistics; research data; technical designs; customer and supplier lists; profit and loss data; overhead and operating costs; and information on financial condition.

34. The second of Exemption 4's specific criteria, requiring that the information be "obtained from a person," is easily met in almost all circumstances. The term "person" refers to individuals as well as to a wide range of entities, including the PCAs whose submissions are at issue in this litigation.

35. Where the submitter of the information is obliged to furnish commercial or financial information to the government – as it is undisputed the Department's debt-collection contractors were required by Chapters 16 and 17 of the PCA Procedures Manual to submit the information responsive to Item 2 of EPIC's request – commercial matter is privileged and confidential for purposes of Exemption 4 if disclosure of the information is likely to have either of the following effects: (1) to impair the Government's ability to obtain necessary information in the future; or (2) to cause substantial harm to the competitive position of the submitter.

36. Pursuant to Exemption 4, the Department denied Plaintiff access to information reflecting proprietary strategies designed, selected and used by the PCAs to maximize and demonstrate contract performance for their commercial clients, including but not limited to, the Department. Under the terms of their contract with the Department, the Department required the PCAs to submit this information, which is contained on all 1,430 pages of the Quality Control Reports identified as responsive to Item 2 of EPIC's FOIA request.

37. Pursuant to Executive Order 12,600, 3 C.F.R. 235 (1988), reprinted in 5 U.S.C. § 552 note (2006), my office sought and obtained PCA advice concerning the competitive harm likely to result to submitters from disclosure of the information withheld pursuant to Exemption 4. It is my understanding from the advice received that the information at issue: (a) was designed, created and implemented by the PCAs for their own use as a method of self-monitoring contract performance, not just for the Department but for other clients as well; and (b) identifies specific data and key elements of contract performance implicating proprietary strategies designed to maximize performance by ensuring contractual compliance, improving productivity and minimizing errors. I understand further that disclosure of these proprietary elements in the Quality Control Reports would enable a PCA's competitors to achieve similar high standards and performance, minimizing the competitive advantage gained by the submitter through maintenance of its unique quality control standards, and that such compromise of a PCA's strategic advantage would likely result in substantial revenue loss to the PCA submitter.

38. Exemption 4 protects the information redacted from the Quality Control Reports because public disclosure of this information would be likely to cause substantial harm to the

PCAs' competitive positions. Specifically, disclosure of the methods a PCA has selected to measure and demonstrate the caliber of its contract performance would compromise the firm's ability to compete against other PCAs for performance-based awards and bonuses, to the detriment of their market positions in a highly competitive commercial environment.

39. The information withheld pursuant to Exemption 4 is identified in the <u>Vaughn</u> Index attached as Exhibit G.

I declare under penalty of perjury that the foregoing is true and correct.

Executed at Washington, DC, this 26th day of September, 2013.

Ann Marie Pedersen, Esq.